FITZPATRICK, J.
¶1 This appeal concerns the efforts of the Wisconsin Department of Health Services (DHS) to recover payments DHS made to Lee Quality Home Care LLC, a provider of personal care services to Medicaid recipients. Lee Quality challenges DHS's determinations that: Lee Quality's personal care workers were not trained or supervised as required by DHS administrative rules; and DHS can recover payments made to Lee Quality for the services provided by those workers.
¶2 We conclude that there was substantial evidence in the record to support DHS's finding that Lee Quality personal care workers did not have the requisite training. We also conclude that DHS has the authority to recover payments made to Lee Quality for personal care services provided by those workers. As to the supervision of Lee Quality personal care workers, we conclude that DHS erred in finding that Lee Quality made a material concession about the evidence, and that DHS did not consider material evidence regarding that issue. As we explain, we direct the circuit court to remand this matter to DHS for a determination of the supervision issue in light of relevant evidence in the record. Therefore, we affirm in part, reverse in part and direct the circuit court to remand to DHS for further proceedings consistent with this opinion.
BACKGROUND
¶3 There is no dispute regarding the following facts.
¶4 "Medicaid is a cooperative federal-state program through which the Federal Government provides financial assistance to States so that they may furnish medical care to needy individuals." Wilder v. Virginia Hosp. Ass'n , 496 U.S. 498, 502 (1990). Wisconsin's Medicaid program is administered by DHS. See State v. Abbott Labs. , 2012 WI 62, ¶3, 341 Wis. 2d 510, 816 N.W.2d 145. Pertinent to this case, DHS's administration of Medicaid in Wisconsin includes reimbursing providers for services rendered to program participants, establishing criteria for Medicaid participation and reimbursement of providers, and enforcing compliance with those requirements by providers. See WIS. STAT . § 49.45(2) (2015-16)[1] ; WIS. ADMIN. CODE § DHS 107.01(1) (Nov. 2018)[2] ; and Newcap, Inc. v. DHS , 2018 WI App 40, ¶4, 383 Wis. 2d 515, 916 N.W.2d 173.
¶5 Lee Quality is a provider of personal care services through its personal care workers and receives Medicaid reimbursement payments for much of this care. See, e.g. , WIS. STAT . § 49.45(42)(d) 3.e. Under WIS. ADMIN. CODE § DHS 107.112(1)(a), "[p]ersonal care services are medically oriented activities related to assisting a recipient with activities of daily living necessary to maintain the recipient in his or her place of residence in the community." Sec. DHS 107.112(1)(a). Examples of "personal care services" are listed in § DHS 107.112(1)(b)1.-13. and include assistance with activities such as bathing, getting in and out of bed, dressing and undressing, meal preparation, food purchasing and meal serving, among other activities. Secs. DHS 107.112(1)(b)1.-13., (1)(a).
¶6 Pursuant to WIS. STAT . §§ 49.45(3)(g)1. and 49.46(2)(b) 6.j., and 42 U.S.C. § 1396a(a)(42) (2012),[3] DHS conducted an audit of services provided by Lee Quality. As a result of that audit, DHS issued to Lee Quality a Notice of Intent to Recover approximately $99,000.00 of allegedly improper Medicaid reimbursement payments made to Lee Quality during the period covered by the audit.
¶7 DHS asserts that the payments should not have been made because of two reasons: (a) a lack of training of Lee Quality's personal care workers; or (b) a lack of timely supervisory visits with Lee Quality's personal care workers by a registered nurse. Both the training and supervision requirements of personal care workers are detailed in DHS administrative rules, and we consider the specifics of these rules in the Discussion section, below.
¶8 Lee Quality objected to DHS's request to recover the approximately $99,000.00 amount, and a contested case hearing was held before an administrative law judge (ALJ) of the Division of Hearings and Appeals. After the hearing, the ALJ issued a Proposed Decision agreeing with DHS's position, including findings that Lee Quality services were not reimbursable by Medicaid either because of a lack of the requisite training of Lee Quality's personal care workers or a lack of required supervisory visits by a registered nurse with the personal care workers. The ALJ also determined that DHS has the authority under applicable Wisconsin law to recover the payments made to Lee Quality for the non-reimbursable services.
¶9 DHS adopted the ALJ's Proposed Decision as its own final decision pursuant to WIS. STAT . § 227.46(2). Lee Quality requested a rehearing which DHS denied. Lee Quality filed a WIS. STAT. ch. 227 petition for judicial review in the La Crosse County Circuit Court. The circuit court affirmed DHS's final decision. Lee Quality now appeals.
¶10 Other pertinent facts are mentioned in the discussion that follows.
DISCUSSION
¶11 First, we discuss DHS's findings about whether Lee Quality personal care workers received the training required by DHS administrative rules, and we affirm those findings of DHS. Second, we conclude that DHS has the authority to recover Medicaid reimbursement payments made to Lee Quality for services performed by personal care workers who did not receive the required training. Finally, we discuss DHS's finding that Lee Quality personal care workers did not have the supervision by a registered nurse required by DHS administrative rules. DHS found that Lee Quality made a concession about this issue, but we conclude that the record does not support that finding. We also conclude that DHS did not consider material evidence in the record about the supervision of Lee Quality personal care workers by a registered nurse. Because those errors may make a difference to the result, we reverse DHS's findings on the supervision issue and direct the circuit court to remand to the agency for further proceedings consistent with this opinion.
I. Standard of Review, and Interpretation of Statutes and Administrative Rules.
¶12 In an appeal of a circuit court order reviewing an agency decision, we review the decision of the agency, not that of the circuit court. Hilton ex rel. Pages Homeowners' Ass'n v. DNR , 2006 WI 84, ¶15, 293 Wis. 2d 1, 717 N.W.2d 166. When reviewing findings of fact made by the agency, we apply the "substantial evidence" standard. Id. , ¶16; WIS. STAT. § 227.57(6). That standard requires us to ask whether, after considering all the evidence in the record, reasonable minds could arrive at the same conclusion and, if so, we must affirm DHS's findings. Hilton , 293 Wis. 2d 1, ¶16. We accord no deference to DHS's interpretations of law and review de novo questions of statutory interpretation and interpretation of regulations. See Tetra Tech EC, Inc. v. DOR , 2018 WI 75, ¶108, 382 Wis. 2d 496, 914 N.W.2d 21 ("We have also decided to end our practice of deferring to administrative agencies' conclusions of law."); see also WIS. STAT. § 227.57(11) (recently amended by 2017 Wis. Act 369 to read: "Upon review of an agency action or decision, the court shall accord no deference to the agency's interpretation of law."). But, we will give "due weight" to the "experience, technical competence, and specialized knowledge" of the agency involved in considering its arguments. Tetra Tech , 382 Wis. 2d 496, ¶108 ; see § 227.57(10).
¶13 The questions before us require the interpretation of statutes and administrative rules. "[W]hen interpreting administrative regulations, we use the same rules of interpretation as we apply to statutes." DaimlerChrysler v. LIRC , 2007 WI 15, ¶10, 299 Wis. 2d 1, 727 N.W.2d 311.
¶14 "[S]tatutory interpretation 'begins with the language of the statute. If the meaning of the statute is plain, we ordinarily stop the inquiry.' " State ex rel. Kalal v. Circuit Court for Dane Cty. , 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110 (quoting Seider v. O'Connell , 2000 WI 76, ¶43, 236 Wis. 2d 211, 612 N.W.2d 659 ). Nonetheless, "scope, context, and purpose are perfectly relevant" to an interpretation of a statute as long as "the scope, context, and purpose are ascertainable from the text and structure of the statute itself." Id. , ¶48. More specifically, we interpret the language of a statute or rule "in the context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes; and reasonably, to avoid absurd or unreasonable results." Id. , ¶46.
¶15 In a similar vein, "[w]hen an administrative agency promulgates regulations pursuant to a power delegated by the legislature, we construe those regulations 'together with the statute to make, if possible, an effectual piece of legislation in harmony with common sense and sound reason.' " DaimlerChrysler , 299 Wis. 2d 1, ¶10 (quoting State v. Busch , 217 Wis. 2d 429, 441, 576 N.W.2d 904 (1998) ).
II. Personal Care Worker Training.
¶16 DHS argues that Lee Quality did not train its personal care workers as required by DHS administrative rules. We conclude that substantial evidence in the record supports this finding by the ALJ.[4]
A. Applicable Administrative Rules.
¶17 DHS has promulgated rules to implement the authority granted to DHS through the applicable Wisconsin Statutes. See, e.g. , WIS. STAT. § 49.45(2)(a) 10.c., 11.b., and 12.b.; see also WIS. STAT . § 227.10(1), (2m). Pertinent to this case, DHS administrative rules set forth training requirements for "personal care workers" such as those employed by or under contract to Lee Quality as a "personal care provider," and we now consider those rules.[5]
¶18 For context, we repeat that, under WIS. ADMIN. CODE § DHS 107.112(1)(a), "[p]ersonal care services are medically oriented activities related to assisting a recipient with activities of daily living necessary to maintain the recipient in his or her place of residence in the community." Sec. DHS 107.112(1)(a). Examples of "personal care services" include assistance with bathing, getting in and out of bed, dressing and undressing, meal preparation, food purchasing and meal serving, among other activities. Secs. DHS 107.112(1)(a), (1)(b)1.-13.
¶19 DHS administrative rules require that a "personal care provider shall document and implement a system of personnel management, if more than one personal care worker is employed or under contract," and that personnel management system must contain certain provisions. WIS. ADMIN. CODE § DHS 105.17(1n) (Feb. 2017).[6] Those provisions include the following requirements. The personal care provider must "[p]rovide orientation and on-going instruction for ... personal care workers. Personal care workers shall receive orientation before providing services to a client."[7] Sec. DHS 105.17(1n)(a)2. That orientation "shall include training on all of the following: ... Training shall be provided for each skill the personal care worker is assigned and shall include a successful demonstration of each skill by the personal care worker to the qualified trainer, under the supervision of the RN [registered nurse] supervisor, prior to providing the service to a client independently." Sec. DHS 105.17(1n)(a)2.b.; see also § DHS 105.17(1n)(b) (personal care worker may not "be assigned any duty for which he or she is not trained"); WIS. ADMIN. CODE § DHS 107.112(1)(a) ("[P]ersonal care worker shall be assigned by the supervising registered nurse to specific recipients to do specific tasks for those recipients for which the personal care worker has been trained.... The personal care worker is limited to performing only those tasks and services as assigned for each recipient and for which he or she has been specifically trained."). In addition, the personal care provider must maintain a written record of the personal care workers' training furnished by the provider regarding those skills. Secs. DHS 107.112(1)(a), 105.17(1g)(c)5.
B. ALJ's Finding of Failure to Train.
¶20 DHS's auditor testified at the contested case hearing that Lee Quality personal care workers who provided personal care services to clients for which Lee Quality was paid by DHS were not trained as required by DHS rules, and that the failure to train was confirmed by a lack of records of the requisite training. The ALJ found that Lee Quality's personal care workers were not trained as called for by DHS's administrative rules and that:
[Lee Quality] has not submitted any credible, regularly kept business record showing this training, either from a registered nurse or someone else qualified to provide it. Therefore, the portion of the overpayment attributable to lack of training is upheld.
¶21 Lee Quality posits various reasons why those findings of the ALJ are not supported by substantial evidence. We address, and reject, each in turn.
C. Lee Quality Records.
¶22 Lee Quality asserts that four sets of records substantiate its position that its personal care workers had the requisite training. We conclude that those records do not constitute a basis to reject the ALJ's findings on this issue.
¶23 First, Lee Quality points to "training waivers" signed by its personal care workers, stating that each worker had six or more months' experience working as a personal care worker for another care agency. These waivers, however, do not satisfy the present requirements under DHS administrative rules.
¶24 A previous version of the Wisconsin Administrative Code allowed personal care workers to be trained for "a minimum of 40 classroom hours, at least 25 of which shall be devoted to personal and restorative care; or 6 months of equivalent experience." WIS. ADMIN. CODE § DHS 105.17(3)(a)1. (July 2010). However, no such training exception based on previous employment was in place at the time of the audit in 2012 or now. Rather, the requirement is that each personal care worker be trained in each skill they are to perform for clients, and it is Lee Quality's duty to provide that training under the supervision of a registered nurse. See § DHS 105.17(1n)(a)-(b), (3)(a) ; WIS. ADMIN. CODE § DHS 107.112(1)(a). That Lee Quality's personal care workers have six months of experience and performed certain tasks at a previous employer does not demonstrate that they have been trained in each task they perform for Lee Quality's clients as demanded by applicable DHS rules.
¶25 According to Lee Quality, a second set of records shows that its personal care workers were trained in the tasks performed. But, those documents evidence no more than that, at some point in time, some of the Lee Quality personal care workers watched training videos. Nothing in those records leads to the conclusion that a registered nurse supervised the personal care workers as required by the applicable DHS administrative rules.
¶26 A third set of records relied on by Lee Quality shows that a registered nurse saw some Lee Quality personal care workers perform some skills that are "personal care services" as defined and mentioned in WIS. ADMIN. CODE § DHS 107.112(1)(a), (b)1.-13. Those records are insufficient to meet the training requirements for personal care workers because the records do not evidence training for "each skill the personal care worker is assigned," WIS. ADMIN. CODE § DHS 105.17(1n)(a)2.b., and Lee Quality makes no substantive attempt to link those records to those skills assigned to its personal care workers. Sec. DHS 105.17(1n)(a)2.b. Further, those observations by the registered nurse occurred only after the personal care workers had already been providing personal care services to clients. So, even if it is assumed that the registered nurse observations of personal care workers could be a substitute for the requisite training, the timing of the supervision does not meet the demands of the DHS administrative rules which state that any such training must occur prior to the time the Lee Quality personal care worker provides personal care services for clients. Id. ; § DHS 107.112(1)(a).
¶27 A fourth set of records proffered by Lee Quality lists tasks the personal care workers performed in their prior employment, but those records do not show that any training by a prior employer was done under registered nurse supervision, as called for by DHS administrative rules. So, those records do not substantiate that Lee Quality personal care workers had the necessary training.
D. Nurse Lee's Letter.
¶28 Next, Lee Quality relies on a letter written by a Nurse Lee to support its argument that the personal care workers were properly trained under DHS rules. That letter claims, in part, that Nurse Lee observed the personal care workers performing or demonstrating assigned personal care tasks. Lee Quality asserts that this letter, in that respect, corroborates the records mentioned above in Section II. C. of this opinion. We conclude that the Lee letter does not advance Lee Quality's position in any appreciable way.
¶29 First, any attempted corroboration through the Nurse Lee letter makes no difference to the result because the records discussed in Section II. C. do not show that the Lee Quality personal care workers had the requisite training as set forth in DHS administrative rules. Second, the ALJ found that Nurse Lee's letter, as it concerns the training of the personal care workers, was not credible. Lee Quality asks this court to ignore the ALJ's determination on credibility. This we can not do because credibility determinations are left to the ALJ and not this court. See West Bend Co. v. LIRC , 149 Wis. 2d 110, 118, 438 N.W.2d 823 (1989) (a court cannot substitute its judgment for that of the agency when considering the credibility of a witness); WIS. STAT. § 227.57(6) ; Painter v. Dentistry Examining Bd. , 2003 WI App 123, ¶18, 265 Wis. 2d 248, 665 N.W.2d 397 ("[T]he credibility of the witnesses and the persuasiveness of their testimony are for the [agency], not the courts, to determine."). Nor has Lee Quality provided any valid basis to question the determination of the ALJ regarding the credibility of the Nurse Lee letter. See Global Steel Prods. Corp. v. Ecklund Carriers, Inc. , 2002 WI App 91, ¶10, 253 Wis. 2d 588, 644 N.W.2d 269 (we will not overturn credibility determinations on appeal "unless they are inherently or patently incredible or in conflict with the uniform course of nature or with fully established or conceded facts").
E. Application of DHS Training Requirements to Lee Quality's Personal Care Workers.
¶30 Lee Quality contends that it has complied with all DHS training requirements for its personal care workers either because those requirements were relaxed before DHS's audit of Lee Quality or because those regulations were not in place at the time of the audit. We reject Lee Quality's contentions.
¶31 Lee Quality argues that DHS relaxed personal care worker training requirements in 2011 and, accordingly, its training of personal care workers meets all mandates in the DHS administrative rules. However, the ForwardHealth Update document that Lee Quality relies on does not support Lee Quality's argument. Rather, the document states in pertinent part that registered nurse supervisors are to "[a]ssure the PCW is trained for the specific tasks the PCW is assigned to provide" the client. Nothing in that document leads to the conclusion that a change in DHS administrative rules in 2011 relaxed the training requirements for personal care workers.
¶32 Lee Quality also argues that, at the time of the DHS audit of Lee Quality, training of personal care workers was not required. Specifically, Lee Quality contends: "As an initial matter, during the time period covered by the audit DHS had no policy requiring any specific training or documentation of training." For this, Lee Quality focuses on one sentence from a much longer DHS document. It is unclear from the language in that one sentence that it applies to the issues before this court. More importantly, a single sentence in one DHS document does not repeal the applicable DHS administrative rules already discussed. The history of the applicable DHS regulations shows that those regulations have not changed in any substantive way from prior to the time of the DHS audit of Lee Quality in 2012 until the present. See WIS. ADMIN. CODE §§ DHS 105.17 (last revised by WIS. ADMIN. REGISTER No. 667 (July 2011) ), 107.112 (last revised by WIS. ADMIN. REGISTER No. 636 (Dec. 2008) ). Indeed, in Newcap , this court held that the provisions of WIS. ADMIN. CODE chs. DHS 105 and 107 (which concern training of personal care workers) have not changed from before the time of the Lee Quality audit by DHS until at least June 2017. Newcap , 383 Wis. 2d 515, ¶4 n.3, ¶10 n.5.
¶33 In sum, we conclude that the ALJ's decision that Lee Quality did not provide its personal care workers with the training required by DHS administrative rules was based upon substantial evidence present in the record, and we affirm that decision.
III. DHS May Recover Payments Made to Lee Quality Based on the Failure to Train.
¶34 Lee Quality argues that DHS exceeded its authority by seeking to recoup payments DHS made to Lee Quality based on the failure to properly train its personal care workers. We reject Lee Quality's contentions and conclude that DHS has the authority to recover those payments from Lee Quality.
A. Applicable Authorities.
¶35 Generally, DHS is required to "reimburse providers for medically necessary and appropriate health care services ... when provided to currently eligible medical assistance recipients." WIS. ADMIN. CODE § DHS 107.01(1). However, a personal care provider is to be reimbursed only if it "complies with applicable state and federal procedural requirements relating to the delivery of the service." WIS. ADMIN. CODE § DHS 106.02(4) (Jan. 2014).[8] More particularly, "[s]ervices which fail to comply with program policies or state and federal statutes, rules and regulations" are non-reimbursable. WIS. ADMIN. CODE § DHS 107.02(2)(a).
¶36 Wisconsin law provides that DHS is authorized to recover payments made to a personal care provider such as Lee Quality. WISCONSIN STAT. § 49.45(2)(a) 10.a. states: "Duties. The department [DHS] shall: ... After reasonable notice and opportunity for hearing, recover money improperly or erroneously paid or overpayments to a provider."[9] Sec. 49.45(2)(a) 10.a. That statute describes various methods DHS may use to recover such amounts from the provider, including "requiring the provider to make direct payment to the department." Id. A DHS administrative rule tracks that statutory language regarding recoupment of payments from a provider and states: "If the department finds that a provider has received an overpayment, including but not limited to erroneous ... and improper payments regardless of cause," then DHS may recover the amounts by various methods consistent with the language in § 49.45(2)(a) 10.a. WIS. ADMIN. CODE § DHS 108.02(9)(a) (Dec. 2013).[10] Lee Quality does not dispute that "improper payment" means "any payment that should not have been made or that was made in an incorrect amount under statutory, contractual, administrative, or other legally applicable requirement." See 42 C.F.R. § 431.958 (2018) (defining "improper payment").[11]
B. Analysis.
¶37 We have already affirmed the ALJ's finding that Lee Quality did not train its personal care workers consistent with the provisions of DHS administrative rules before those personal care workers provided personal care services to clients. And, Lee Quality does not dispute that it was paid by DHS for services provided by those Lee Quality personal care workers. It then follows that those payments from DHS to Lee Quality come within the definition of "improper payments" because the payments should not have been made based on Lee Quality's failure to comply with a "legally applicable requirement," here the requirement to train the personal care workers within the DHS administrative rule standards. See 42 C.F.R. § 431.958 ; WIS. STAT. § 49.45(2)(a) 10.a. Therefore, we conclude that DHS has the authority to recover those payments from Lee Quality.[12]
¶38 Lee Quality makes several arguments that, regardless of the authority granted to DHS in WIS. STAT. § 49.45(2)(a) 10.a. and its accompanying regulation, DHS is not entitled to recover the payments made by DHS to Lee Quality for personal care services. We address, and reject, each of these arguments as follows.[13]
C. Lee Quality's Actual Provision of Services.
¶39 Lee Quality contends that the DHS has no statutory authority to recover the payments made to Lee Quality because Lee Quality "actually provided" the personal care services. More specifically, Lee Quality argues that, pursuant to WIS. STAT. § 49.45(3)(f), "where it appears that the provider delivered the care," DHS is not entitled to recover the payments. Related to that contention, Lee Quality asserts that the payments from DHS to Lee Quality should not be considered "improper" under WIS. STAT. § 49.45(2)(a) 10.a. Instead, the failure to properly train the personal care workers should be considered only as non-compliance with a program, and Lee Quality should be allowed to correct this deficiency without recovery of payments.
¶40 In support of its position, Lee Quality cites WIS. ADMIN. CODE § DHS 105.17(4)(c) which provides that, when programs are not compliant, DHS "shall promptly notify the provider of the specific rule violated, state the facts that constitute the deficiency and specify the date by which the provider is required to correct the deficiency." Sec. DHS 105.17(4)(c). In other words, according to Lee Quality, as long as a personal care service is provided, it makes no difference whether the personal care worker was untrained, or if there are any other violations of statutes or regulations, because DHS is unable to recover any amounts paid for services actually provided, and DHS can only demand that the provider's deficiency be corrected going forward.
¶41 We reject Lee Quality's argument because it ignores the clear language of WIS. STAT. § 49.45(2)(a) 10.a. and its accompanying regulation, WIS. ADMIN. CODE § DHS 108.02(9)(a). Those authorities state that, when a provider has received an "improper payment" (as is the case here), DHS has the authority to demand recovery of that amount from the provider such as Lee Quality. The interpretation of WIS. ADMIN. CODE § DHS 105.17(4)(c) advanced by Lee Quality would, in effect, read out of existence the provisions of § 49.45(2)(a) 10.a. and swallow its accompanying regulation. We may not read a statute or an administrative rule out of existence based on a strained reading of one particular regulation by Lee Quality. See Adams v. State Livestock Facilities Siting Review Bd. , 2010 WI App 88, ¶41, 327 Wis. 2d 676, 787 N.W.2d 941.
D. Lack of Documentation.
¶42 Next, Lee Quality contends that no Wisconsin statute grants DHS the authority to recover payments based only on the provider's failure to comply with documentation requirements when the personal care workers provided the care in question. This argument misconstrues the basis of DHS's claim for recovery of payments. DHS is not seeking reimbursement based upon Lee Quality's failure to maintain documents. The problem is Lee Quality's failure to train its personal care workers to the standards set in the DHS administrative rules, and that is the basis for the recovery of the amounts from Lee Quality. The lack of documentation for that training is not the violation of the rule, but only more evidence of Lee Quality's failure to properly train its personal care workers.
E. Other Sanctions Available to DHS.
¶43 Finally, Lee Quality contends that, because Wisconsin law grants DHS the authority to impose sanctions other than payment recoupment for providers who fail to comply with the applicable administrative rules, DHS does not have the authority to recover payments from Lee Quality in this situation. Lee Quality's argument fails because Wisconsin law does not limit DHS's authority to recoup payments from providers such as Lee Quality. In fact, pursuant to WIS. ADMIN. CODE § DHS 106.09(1), DHS's ability to impose sanctions codified in ch. DHS 106 does not preclude DHS "from pursuing monetary recovery from a provider at the same time action is initiated to impose sanctions...." Sec. DHS 106.09(1). Moreover, pursuant to an express statement in WIS. ADMIN. CODE § DHS 108.02(9)(a), DHS is given discretion to recover the amounts improperly paid in the manner set forth in that rule. Nothing in that rule, or any other authority, requires DHS to assess alternative sanctions rather than recovery in these circumstances. Therefore, contrary to Lee Quality's implication, DHS's authority to impose sanctions of various types against Lee Quality does not preclude DHS from seeking monetary recovery from Lee Quality.
¶44 For those reasons, we conclude that DHS has the authority to recover from Lee Quality payments made for services provided by Lee Quality personal care workers who did not receive the training required by DHS administrative rules.
IV. Supervision of Personal Care Workers.
¶45 We now address the ALJ's finding that Lee Quality's personal care workers were not supervised by a registered nurse with both the personal care worker and client present at least every sixty days as required by DHS rules. We agree with Lee Quality that the ALJ misconstrued the record regarding a purported concession made by Lee Quality. Also, the ALJ did not consider relevant documents in the record. Those errors may affect the result on the issue regarding supervision of the personal care workers. For those reasons, we direct the circuit court to remand this matter for further proceedings before the agency consistent with this opinion.
A. Applicable Authorities.
¶46 We now discuss the applicable DHS administrative rules and pertinent portions of the Medicaid Provider Handbook.
¶47 Personal care services must be performed by a personal care worker under the supervision of a registered nurse and according to a written plan of care. WIS. ADMIN. CODE § DHS 107.112(3)(a)-(b). A registered nurse must review the client's plan of care, evaluate the client's condition, and review the personal care worker's performance "at least every 60 days." Sec. DHS 107.112(3)(c). This review includes a visit to the client's home. Id. Supervision is generally defined in DHS administrative rules as meaning "at least intermittent face-to-face contact between supervisor and assistant and a regular review of the assistant's work by the supervisor."[14] WIS. ADMIN. CODE § DHS 101.03(173) (Dec. 2008).[15] DHS contends that every 60 days the personal care worker must be present during the supervisory visit by the registered nurse with the client. To support its position on that specific point, DHS cites to a portion of the Medicaid Provider Handbook which DHS contends requires the "RN [registered nurse] supervisor" to "observe[ ] and document[ ]" the personal care worker performing personal care tasks.
¶48 Lee Quality does not contest DHS's assertion that the provisions of the Medicaid Provider Handbook set forth supervisory requirements with which Lee Quality must comply.[16] Specifically, Lee Quality does not dispute that, at the least, it was contractually bound to comply with the provisions of the Medicaid Provider Handbook. The ALJ's Proposed Decision cites to a March 15, 2011 agreement between Lee Quality and DHS in which Lee Quality "acknowledge[d] that by submitting claims it is subject to the 'terms, conditions, and restrictions' set forth in applicable law or the department's publications such as online provider handbooks, bulletins, periodic updates, and prior authorization and billing procedural directives." Lee Quality does not dispute this determination by the ALJ. In addition, Lee Quality does not contest DHS's interpretation of the Medicaid Provider Handbook to mean that the registered nurse supervisor and the personal care worker must be present at the same time every 60 days during the supervisory visit with the client. For those reasons, we will assume DHS's interpretation of the Medicaid Provider Handbook is correct and requires Lee Quality to comply with that publication as it concerns this issue.[17]
B. The Administrative Law Judge's Findings.
¶49 The ALJ found that there was sufficient evidence in the record to support DHS's claim that the Lee Quality personal care workers were not present the same times that the registered nurse met with the clients every 60 days. The ALJ also found that Lee Quality failed to produce documents to show the personal care workers were present with the registered nurse and the client.
¶50 Accordingly, we must determine whether there was sufficient evidence in the record to support the ALJ's findings.
C. Lee Quality's Purported Concession.
¶51 Lee Quality contends that the ALJ erred because he relied on a concession that Lee Quality says it never made. Specifically, the ALJ found that Lee Quality conceded that the "records it initially submitted [to DHS at the time of the audit] do not establish that the nurse and care worker were present at the same time." The ALJ did not cite to any portion of the record in making the finding that this concession was made by Lee Quality. In this court, DHS does not cite to the record for this purported concession but cites only to the ALJ's finding on this particular point.
¶52 Pursuant to WIS. STAT. § 227.57(6), our review of an agency's decision is set aside or remanded to the agency "if [the court] finds that the agency's action depends on any finding of fact that is not supported by substantial evidence in the record." Sec. 227.57(6) ; see also Crystal Lake Cheese Factory v. LIRC , 2003 WI 106, ¶27, 264 Wis. 2d 200, 664 N.W.2d 651. A finding of fact must be reasonable to be upheld. Kitten v. DWD , 2002 WI 54, ¶5, 252 Wis. 2d 561, 644 N.W.2d 649.
¶53 The finding by the ALJ about this purported concession is not supported by evidence in the record, and DHS cites to no evidence in the record to support that finding. We conclude that there is not substantial evidence in the record that Lee Quality conceded that the records it submitted initially to DHS at the time of the audit did not establish that the registered nurse and the personal care workers were present with the client at the same time.
D. Documents in the Record.
¶54 Next, Lee Quality argues that documents in the record were not considered by the ALJ and are material to the analysis.
¶55 Lee Quality asserts that the ALJ did not consider what Lee Quality refers to as Nurse Supervisor Visit Forms.[18] The Visit Forms were signed by the registered nurse and the client, and each Visit Form submitted by Lee Quality shows that the personal care worker was present during the nurse's supervisory visit. As to the Visit Forms, Lee Quality makes the following assertions, and DHS does not dispute any of the assertions. The Visit Forms were submitted by Lee Quality during the audit process.[19] Each Visit Form shows that the registered nurse, the personal care worker and the client were at the supervisory visit. In addition, the Visit Forms were introduced into evidence by DHS, and DHS does not now argue that the Visit Forms were inadmissible. Lee Quality raised, in its motion for a re-hearing that was denied by DHS, the failure of the ALJ to consider these documents.
¶56 In response to Lee Quality's arguments about the Visit Forms, DHS requests that this court find the Visit Forms to be "not credible." But, in our review of an administrative proceeding under Chapter 227, this court cannot substitute its judgment for that of the agency when considering credibility or weight to be given to evidence. See West Bend , 149 Wis. 2d at 118 ; WIS. STAT. § 227.57(6). "[T]he credibility of the witnesses and the persuasiveness of their testimony are for the [agency], not the courts, to determine." Painter , 265 Wis. 2d 248, ¶18. When the ALJ has not determined credibility, or weight, to be given to certain evidence, this court cannot do so at the agency's request.[20]
¶57 Next, DHS challenges Lee Quality's reliance on the Visit Forms because, according to DHS, even if the personal care worker was present during the nurse's supervisory visit with the client, it is irrelevant because the personal care worker was not billing for his or her time during that visit.[21] We reject DHS's argument.
¶58 DHS's analysis focuses on two points. The first linchpin in DHS's analysis is as follows: "Even if an employee could 'volunteer' to do work she was hired to be paid to do, here the personal care workers submitted no evidence proving that they were present during the supervisory visit in any capacity." As shown above, there is such evidence in the form of the Visit Forms signed by the registered nurse supervisor and the client stating that the personal care worker was present. True, that evidence was not considered by the ALJ, and no decision has been made as to the weight to be given to the Visit Forms. However, there is evidence in the record to support Lee Quality's assertion. For those reasons, this important part of DHS's analysis on this topic fails.
¶59 The other necessary part of DHS's reasoning as to why the Visit Forms are irrelevant relies on the language of an administrative rule. DHS argues that the personal care worker must be paid for the time of the supervisory visit for that time to be considered a proper supervisory visit. For this, DHS relies on WIS. ADMIN. CODE § DHS 105.17(1n)(fm), which states that a personal care provider shall "[d]ocument performance of personal care services by personal care workers by maintaining time sheets of personal care workers which document the types and duration of services provided, by funding source." Sec. DHS 105.17(1n)(fm). We conclude that the assertion of DHS concerning the personal care worker's failure to bill for the time of the supervision misses the mark.
¶60 The pertinent question is not whether the personal care worker was paid at the time of this required supervision. Rather, the question is whether the supervision occurred so as to comply with the applicable administrative rule which details the required supervision. Also, the very general regulation relied on by DHS cannot reasonably be construed as DHS contends. The administrative rule does not state that, for the nurse supervision to be valid, the personal care worker must bill for that time. DHS points to no other statute or regulation that requires any certain documentation concerning the billing of the time for the personal care worker during the nurse supervision of the personal care worker. Indeed, the regulation which requires record keeping of supervisory visits, WIS. ADMIN. CODE § DHS 105.17(1g)(c)8., does not require any particular billing status of the personal care worker.
¶61 In sum, we conclude that there is not substantial evidence in the record that Lee Quality conceded that the records it initially submitted to DHS for audit purposes did not establish that the registered nurse and the personal care worker were present with the client at the same time. We also conclude that the ALJ failed to consider relevant evidence in the record that may affect the result on the nurse supervision issue. Therefore, we direct the circuit court to remand this matter to the agency for consideration of all relevant evidence on this issue consistent with this opinion. See WIS. STAT. § 227.57(6).
E. Newcap .
¶62 In supplemental briefing in this court, DHS, in a very short argument, relies on Newcap for one particular point. Newcap holds, in part, that DHS may deny a claim or recover a payment already made to a provider when DHS cannot verify the actual provision of services, or the appropriateness and accuracy of claims, based on the records DHS requires the provider to maintain. See Newcap , 383 Wis. 2d 515, ¶19. This holding in Newcap was based on the language in WIS. STAT. § 49.45(3)(f)1. Lee Quality takes the position that the provisions of § 49.45(3)(f)1. are not applicable in this situation because that statute concerns recordkeeping requirements to verify claims for reimbursement, and the Visit Forms are not designed or used for that purpose. We decline to address this argument for two reasons. First, the truncated briefing of the parties does not allow us to consider developed arguments in this context, and those developed arguments are best taken up upon remand to the agency. Second, on this record, we cannot determine whether the Visit Forms were records that DHS requires Lee Quality to maintain. See id. That issue will also need to be resolved on remand to the agency.
E. Remand.
¶63 We briefly mention two other points regarding the remand to DHS.
¶64 First, the necessity of a remand to DHS to consider the supervision issue depends on whether the recovery of any payments is based solely on the failure to supervise and not also, or only, on the failure to train. The ALJ stated that he "cannot determine exactly what portion of the overpayment the Department attributes to lack of supervision and what portion it attributes to lack of training." The parties on appeal do not clarify this point. If the failure to train applies to all of the payments sought to be recovered, then this opinion resolves the entire appeal. If, however, some of the payments were sought to be recovered only because of improper supervision, then a remand to DHS for further proceedings on the improper supervision issue will be necessary as to those payments, and the ALJ may need to determine the specific amount that DHS may recover from Lee Quality for the failure to train.
¶65 Second, Lee Quality submitted a letter from Nurse Lee that states, in part, that she completed supervisory visits of the personal care workers and that "[t]he actual times of the supervisory visits were schedule [sic] according to the Client, PCW and [her] schedule and not within the actual hour of services." The ALJ addressed this letter from Nurse Lee, and determined that the letter in this respect was prepared in anticipation of litigation, was uncorroborated hearsay, and, consequently, was not credible. In a WIS. STAT. ch. 227 review, "[w]e cannot substitute our judgment for that of the [agency] in respect to the credibility of a witness or the weight to be accorded to the evidence supporting any finding of fact." West Bend , 149 Wis. 2d at 118. On remand we do not limit the ALJ's discretion regarding that letter. The rules of evidence generally do not apply in administrative hearings. WIS. STAT. § 227.45. Administrative findings cannot be grounded in uncorroborated hearsay alone. Village of Menomonee Falls v. DNR , 140 Wis. 2d 579, 610, 412 N.W.2d 505 (Ct. App. 1987) ; see also Gehin v. Wisconsin Grp. Ins. Bd. , 2005 WI 16, ¶¶54-56, 278 Wis. 2d 111, 692 N.W.2d 572. Now, however, the hearsay may no longer be uncorroborated because of the records discussed, above. Therefore, the ALJ may rely (or not rely) on that letter in the ALJ's discretion.
CONCLUSION
¶66 In summary, we conclude that DHS's finding that Lee Quality did not properly train its personal care workers was supported by substantial evidence in the record, and DHS did not exceed its authority in recovering payments for those services from Lee Quality. As to the supervised visits issue, we direct the circuit court to remand this matter to the agency for further proceedings consistent with this opinion.
By the Court. -Order affirmed in part; reversed in part and cause remanded with directions.
Not recommended for publication in the official reports.

All references to the Wisconsin Statutes are to the 2015-16 version unless otherwise noted.

All references to the Wisconsin Administrative Code ch. DHS 107 are to the November 2018 version unless otherwise noted.

All references to the U.S. Code are to the 2012 version unless otherwise noted.

For clarity and ease of reading, we will now refer to the findings of the ALJ in the Proposed Decision that were accepted by DHS in its final decision.

The parties do not dispute that Lee Quality is a "personal care provider" and that persons employed by or under contract to Lee Quality are "personal care workers" as referred to in the applicable DHS administrative rules.

All references to the Wisconsin Administrative Code ch. DHS 105 are to the February 2017 version unless otherwise noted

The parties do not dispute that the persons who were receiving services from Lee Quality personal care workers were "clients" as defined in Wis. Admin. Code § DHS 105.17(1)(a).

All references to the Wisconsin Administrative Code ch. DHS 106 are to the January 2014 version unless otherwise noted.

Lee Quality does not dispute that it was given reasonable notice and opportunity for a hearing regarding recovery of payments for the failure to properly train the personal care workers.

All references to the Wisconsin Administrative Code ch. DHS 108 are to the December 2013 version unless otherwise noted.
The ALJ's Proposed Decision that was accepted as the DHS final decision refers to Wis. Admin. Code § DHS 108.02(9)(a) as a basis for recoupment of improper payments to Lee Quality.

All references to the Code of Federal Regulations are to the 2018 version unless otherwise noted.

In Newcap , this court cited Wis. Stat. § 49.45(2)(a) 10.a. but concluded that the payment made by DHS to the provider was not improper or erroneous because the provider did not violate any statute or regulation. Newcap, Inc. v. DHS , 2018 WI App 40, ¶¶38-39, 383 Wis. 2d 515, 916 N.W.2d 173. For reasons discussed in Section II of this opinion, this case is distinguishable from Newcap on this particular point because payments were made to Lee Quality by DHS for services performed by personal care workers who were not properly trained in violation of DHS administrative rules.

Among Lee Quality's contentions is a very short constitutional takings argument. Also, Lee Quality contends, without any analysis or citation to authority, that Wis. Stat. § 49.45(2)(a) 10.a. and Wis. Admin. Code § DHS 108.02(9)(a) are just methods of recovery rather than statutory and regulatory bases for DHS to recover payments made to Lee Quality. We do not consider these contentions because those are undeveloped. State v. O'Connell , 179 Wis. 2d 598, 609, 508 N.W.2d 23 (Ct. App. 1993) ("We do not consider undeveloped arguments.").

In spite of the clear language of this particular rule, supplemental briefing from DHS twice failed to place the word "intermittent" into a quotation or citation of this particular administrative rule.

All references to the Wisconsin Administrative Code ch. DHS 101 are to the December 2008 version unless otherwise noted.

Indeed, at two points in the briefing in this court, Lee Quality cites to the Medicaid Provider Handbook as authority for its position for a given argument.

Lee Quality indirectly challenges DHS's position that a personal care provider may not receive payment from DHS for personal care services if the supervisory visits with the client and personal care worker are not performed every sixty days. Lee Quality relies on Wis. Stat. § 49.45(2)(a)24m., which states that "each recipient shall be visited in his or her home by a registered nurse at least once in every 12-month period." Sec. 49.45(2)(a)24m. Lee Quality contends that this statute conflicts with Wis. Admin. Code § DHS 107.112(3)(c), which states that "[r]eview of the plan of care, evaluation of the recipient's condition and supervisory review of the personal care worker shall be made by a registered nurse at least every 60 days." Sec. DHS 107.112(3)(c). Lee Quality's interpretation of § 49.45(2)(a)24m. and § DHS 107.112(3)(c) is flawed. "When an administrative agency promulgates regulations pursuant to a power delegated by the legislature, we construe those regulations 'together with the statute to make, if possible, an effectual piece of legislation in harmony with common sense and sound reason.' " DaimlerChrysler v. LIRC , 2007 WI 15, ¶10, 299 Wis. 2d 1, 727 N.W.2d 311 (quoting State v. Busch , 217 Wis. 2d 429, 441, 576 N.W.2d 904 (1998) ). Therefore, if possible, we must construe § 49.45(2)(a)24m. and § DHS 107.112(3)(c) so that they do not conflict. We conclude that statute and that administrative rule do not conflict because the only requirement the Legislature placed on DHS regarding the timing of supervisory visits in § 49.45(2)(a)24m. is that they must occur at least once within a twelve-month period. Section DHS 107.112(3)(c) complies with that rule by requiring visits every sixty days. While the Legislature set a minimum number of visits - once every twelve months - it did not require DHS to promulgate a rule that the visits occur only once during that time period. That § DHS 107.112(3)(c) is stricter than § 49.45(2)(a)24m. does not make the two provisions inconsistent because of the "at least" language used by the Wisconsin Legislature.

We will refer to those records as the "Visit Forms."

This contradicts the purported concession relied on by the ALJ as just discussed.

The ALJ also failed to consider letters in the record signed by Lee Quality clients attesting to information regarding the nurse's supervisory visits while the personal care workers were present. DHS has not responded to these arguments and implicitly concedes that the ALJ failed to consider those records, as well. DHS also contends, in a very short argument, that these letters are hearsay. We consider this argument undeveloped and, at any rate, the rules of evidence generally do not apply at administrative hearings. Wis. Stat. § 227.45.

For its part, Lee Quality concedes that the pertinent time sheets do not show that the personal care workers were billing or being paid at those times.